IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS

CHARLES R. PENNINGER,

        Plaintiff,

  Vs.

                              No. 12-2302-SAC

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

        Defendant.

MEMORANDUM AND ORDER

      This is an action reviewing the final decision of the defendant
Commissioner of Social Security ("Commissioner") that denied the claimant
Charles R. Penninger's ("Penninger") application for disability insurance
benefits ("DIB") under Title II of the Social Security Act ("Act"). With the
administrative record (Dk. 3) and the parties' briefs on file pursuant to D. Kan.
Rule 83.7.1 (Dks. 4, 11, and 12), the case is ripe for review and decision.

**STANDARD OF REVIEW**

      The court's standard of review is set forth in 42 U.S.C. § 405(g),
which provides that the commissioner's finding "as to any fact, if supported by
substantial evidence, shall be conclusive." The court also reviews "whether the
correct legal standards were applied." *Hackett v. Barnhart*, 395 F.3d 1168,
1172 (10th Cir. 2005). Substantial evidence is that which "a reasonable mind
might accept as adequate to support a conclusion." *Richardson v. Persales*,

402 U.S. 389, 401 (1971) (quotation and citation omitted). "It requires more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citation omitted). The review for substantial evidence "must be based upon the record taken as a whole" while keeping in mind "evidence is not substantial if it is overwhelmed by other evidence in the record." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (internal quotation marks and citations omitted). In its review of "whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases, . . . [the court] will not reweigh the evidence or substitute . . . [its] judgment for the Commissioner's." *Lax*, 489 F.3d at 1084 (internal quotation marks and citation omitted).

The court's duty to assess whether substantial evidence exists: "is not merely a quantitative exercise. Evidence is not substantial 'if it is overwhelmed by other evidence--particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion.'" *Gossett v. Bowen*, 862 F.2d 802, 805 (10th Cir. 1988) (quoting *Fulton v. Heckler*, 760 F.2d 1052, 1055 (10th Cir. 1985)). At the same time, the court "may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Lax v. Astrue*, 489 F.3d at 1084 (internal quotation marks and citation omitted). The court will "meticulously examine the record as a whole, including anything that may

undercut or detract from the ALJ's findings in order to determine if the substantiality test has been made." *Wall v. Astrue*, 561 F.3d at 1052 (internal quotation marks and citation omitted).

By statute, a disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual "shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. § 423(d)(2)(A).

A five-step sequential process is used in evaluating a claim of disability. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). The first step entails determining whether the "claimant is presently engaged in substantial gainful activity." *Wall v. Astrue*, 561 F.3d at 1052 (internal quotation marks and citation omitted). The second step requires the claimant to show he suffers from a "severe impairment," that is, any "impairment or combination of impairments which limits [the claimant's] physical or mental ability to do basic work activities." *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003) (internal quotation marks and regulatory citations omitted). At step three, the claimant is to show his impairment is equivalent in severity to a listed impairment. *Lax*,

489 F.3d at 1084. "If a claimant cannot meet a listing at step three, he continues to step four, which requires the claimant to show that the impairment or combination of impairments prevents him from performing his past work." *Id.* Should the claimant meet his burden at step four, the Commissioner then assumes the burden at step five of showing "that the claimant retains sufficient RFC [residual functional capacity] to perform work in the national economy" considering the claimant's age, education, and work experience. *Wilson v. Astrue*, 602 F.3d 1136, 1139 (10th Cir. 2010) (internal quotation marks and citation omitted). Substantial evidence must support the Commissioner's showing at step five. *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993).

**PROCEDURAL HISTORY**

Penninger applied for DIB on December 31, 2008, alleging a disability beginning May 1, 2006, and continuing through the date last insured. (R. 258). His disability report prepared at the same time of his application listed his illnesses as "Advanced lymes disease, Babesia" and described the limiting conditions as "motor function impairment, fatigue, blurred vision affects ability to focus, memory and concentration deficits, headaches and nausea." (R. 344). After his application was denied initially and on reconsideration, he sought a hearing before the administrative law judge ("ALJ"). Following a hearing in August of 2010 and supplemental hearings in

November of 2010 and March of 2011, the ALJ issued her decision on March 17, 2011, concluding that Penninger was not disabled. (R. 21-28). At step two, she found that Penninger "did not have an impairment or combination of impairments that significantly limited the ability to perform basic work-related activities for 12 consecutive months; therefore, the claimant did not have a serve impairment or combination of impairments." (R. 23). She listed as Penninger's only medically determinable impairment, "Lyme's disease." *Id*. The ALJ gave "considerable weight" to the testimony of the non-examining and non-treating medical expert, Anne Winkler, M.D., and "great weight" to the "State agency medical opinion" of Dr. Bullock. (R. 27). Relying on these medical opinions, the ALJ rejected the medical opinion of the treating physician, Dr. Brewer, that Penninger suffered from chronic Lyme disease and Babesia, as being "unsupported by objective evidence," as being unsupported "by medically acceptable clinical and laboratory diagnostic techniques," and as being "generally inconsistent with the more persuasive opinions in the record." (R. 27-28). The ALJ described giving "little weight" to Dr. Brewer's opinion. (R. 28).

**Is there substantial evidence of record to support the ALJ's determination at step 2 on the plaintiff's medically determinable impairments?**

The ALJ found that Penninger had no medically determinable impairments that were severe during the period from May 1, 2006, through the

last date of insured status, September 30, 2009. Penninger argues he had multiple impairments, individually or in combination, that met the severity threshold. He further argues the ALJ erred in evaluating the weight of the differing medical opinion evidence and erred in failing to consider third party information and observations.

It is Penninger's burden at step two to demonstrate "any impairment or combination of impairments" to be sufficiently severe that it "significantly limits" his "physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). The Tenth Circuit has said that this step requires a claimant to make "a 'de minimis' showing of impairment," but the showing must evidence "more than the mere presence of a condition or ailment." *Hinkle v. Apfel*, 132 F.3d 1349, 1352 (10th Cir. 1997). "[S]tep two [is] designed to identify 'at an early stage' claimants with such slight impairments they would be unlikely to be found disabled even if age, education, and experience were considered." *Id.* (discussing and quoting *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987). "Thus, at step two, the ALJ looks at the claimant's impairment or combination of impairments only and determines the impact the impairment would have on his ability to work." *Id.* Basic work activities are the "the abilities and aptitudes to do most jobs" and include "physical functions," "[c]apacities for seeing . . .," and the facility to understand, remember, and carry out simple instructions; use judgment; and deal with changes in a routine work setting.

20 C.F.R. § 404.1521(b). In Social Security Ruling ("SSR") 85-28, the Secretary clarified that, "A claim may be denied at step two only if the evidence shows that the individual's impairments, when considered in combination, are not medically severe, . . . . If such a finding is not clearly established by medical evidence, however, adjudication must continue through the sequential evaluation process." 1985 WL 56856 at *3; *see Hunter v. Chater*, 83 F.3d 432, 1996 WL 195131 at *1 (10th Cir. 1996) (Table); *Gosch v. Astrue*, 2011 WL 1899289 at *4 (D. Kan. 2011).

It rests with the claimant to present "medical evidence" of impairment and severity during the alleged period of disability. *Jackson v. Colvin*, 2013 WL 2147959 at *2 (D. Kan. 2013). A physical or mental impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. 404.1508. "Only laboratory findings and clinical findings establish a medically determinable impairment; Williams' [claimant's] reported symptoms alone do not do so." *Williams v. Colvin*, 2013 WL 1701049, at *2 (10th Cir. Apr. 19 2013) (citing *See* 20 C.F.R. §§ 416.928, 416.929(b); SSR 96–7p, 1996 WL 374186, at *1; SSR 96–4p, 1996 WL 374187, at *1). Putting these concepts together, "laboratory findings and clinical findings (or 'signs') establish medically determinable impairments, . . . a claimant's reported symptoms do not . . . [b]ut a finding entails

7

'medically acceptable clinical diagnostic techniques' or 'medically acceptable laboratory diagnostic techniques.'" *Holbrook v. Colvin*, 2013 WL 1150298 at *3 (10th Cir. Mar. 21, 2013) (citations to regulations omitted); *see* SSR 96-4p, 1996 WL 374187, at *1 ("In claims in which there are no medical signs or laboratory findings to substantiate the existence of a medically determinable physical or mental impairment, the individual must be found not disabled at step 2."). "Social Security Ruling (SSR) 96–4p further states '[n]o symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment.' SSR 96–4p." *Simon v. Astrue*, 2009 WL 684713 at *2 (D. Kan. 2009). On the other hand, "[m]edically acceptable evidence includes observations made by a physician during physical examination and is not limited to the narrow strictures of laboratory findings or test results." *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) (internal quotation marks and citation omitted).

The ALJ initially found that Penninger had only one medically determinable impairment, Lyme disease, and that Penninger suffered from this impairment through September 30, 2009. (R. 23). And yet, the balance of the ALJ's decision is devoted to findings that Penninger did not have Lyme disease after September of 2007. The ALJ found that Dr. Winkler had testified

that Penninger had "a history of Lyme's disease with positive testing for an acute infection, which resolved after treatment" and that "repeat testing showed the disease was resolved by August or September 2007 after . . . the appropriate treatment." (R. 25). The ALJ observed that Dr. Winkler had "noted there is no evidence of ongoing chronic Lyme's disease" and had "determined that the claimant had no objective findings that would restrict him from a functional standpoint." (R. 25, 26). The ALJ also gave "great weight" to the state agency medical opinion of Dr. Bullock that chronic Lyme disease exists "only when" the disease has "never been treated" and that he had not found "any significant medical or scientific evidence supporting the existence of Lyme's disease not being 100% cured within six months of therapy." (R. 26, 27). The court is at a loss to explain how the ALJ first can find that Penninger has the "medically determinable impairment: Lyme's disease" through September 30, 2009, but then find that all the medical evidence, specifically the opinions of treating physicians based on clinical findings and prior laboratory results, to prove a condition through September 30, 2009, should be rejected as unreliable in favor of the opinions from the non-treating physicians based on current laboratory findings that the claimant had no objective medically determinable Lyme disease after September of 2007. This inconsistency marks the flawed analysis employed in evaluating the physicians' differing opinions over chronic Lyme disease.

The claimant first contends that the ALJ failed to list and consider the additional medially determinable impairments of depression, degenerative disc disease, headaches, sleep apnea, fibromyalgia, and Epstein Barr Virus. The ALJ did cite Dr. Winkler's testimony that the claimant "has some problems with depression," mild degenerative disc disease, "some problems with headaches." (R. 25, 48). Other than accepting Dr. Winkler's conclusion that "the claimant had no objective findings that would restrict him from a functional standpoint," the ALJ does not identify or discuss the medical evidence of record concerning these other diagnosed conditions.

The claimant also points to other diagnosed medical conditions that are not mentioned anywhere by Dr. Winkler or by the ALJ. From the medical record, the claimant cites the progress notes from his referral to Dr. Verstraete, a member of the Mid-America Infectious Disease Consultants, for a second opinion after claimant's initial treatment for Lyme Disease by Dr. Sahgal. (R. 813). Based on his clinical examination in August of 2007, Dr. Verstraete listed the following as his diagnosis: "Lyme dis., Chronic Fatigue, Fibromyalgia, Insomnia" and ordered laboratory work. (R. 813-14). Upon receiving the laboratory work, Dr. Verstraete performed a follow-up examination in September of 2007 and recorded a diagnosis that included transaminitis, sleep apnea, fibromyalgia, and chronic Epstein-Barr virus. (R. 811). Claimant was prescribed home oxygen therapy for the sleep apnea. (R.

826). Finally, the claimant cites objective medical evidence of record showing diagnosis and treatment for thoracic spine tendinitis in March of 2007 (R. 803), "dermatomal thoracic sensory loss" in April of 2007 (R. 599), and a minimal bulge noted at T11-T12 without significant impingement confirmed by the MRI (R. 606). The ALJ's decision does not offer any meaningful discussion of these diagnosed impairments or their severity. Because this case is being remanded for other reasons, the ALJ also shall address these impairments at step two. *See Johnson v. Asture*, 2013 WL 557100 at *5 (D. Kan. 2013).

The claimant next presents the compelling argument that the ALJ erred in according "considerable" weight to Dr. Winkler's testimony, as a non-examining physician, over the medical opinion of Dr. Brewer, the treating physician. In this circuit, it is well settled that "the opinions of physicians who have seen a claimant over a period of time for purposes of treatment are given more weight over the views of consulting physicians or those who only review the medical records and never examine the claimant." *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004) (internal quotation marks and citations omitted). A treating physician's opinion is entitled to such weight due to the unique perspective afforded in the treating relationship "that cannot be obtained from the objective medical findings alone." *Id*. As a general matter, the greatest weight is given to the treating physician's opinion with less to the examining physician and even less to an agency physician, like Dr. Bullock

here. *Id.*

The ALJ's evaluation of a treating physician's opinion follows a sequential analysis:

> First, the ALJ must decide whether the opinion is entitled to controlling weight. For this, she "must first consider whether the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques." Id. [*Watkins v. Barnhart*, 350 F.3d 1297 (10th Cir. 2003]) at 1300 (internal quotation marks omitted). If it is not, then the opinion is not entitled to controlling weight. If it is, then the ALJ must further determine whether the opinion is "consistent with other substantial evidence in the record." *Id.* We have held that an ALJ must make a finding as to whether the physician's opinion is entitled to controlling weight "so that we can properly review the ALJ's determination on appeal." *Id.*

*Jones v. Colvin*, 2013 WL 1777333, at *3 (10th Cir. 2013). In this case, the ALJ found that the treating physician Dr. Brewer's opinion "is not supported by medically acceptable clinical and laboratory diagnostic techniques and is generally inconsistent with the more persuasive opinions in the record" and so "accord[ed] it little weight." (R. 27-28). If such deficiencies lie with Dr. Brewer's opinion, then the ALJ would be justified in denying it controlling weight. *Robinson v. Barnhart*, 366 F.3d 1078, 1082 (10th Cir. 2004).

For her conclusion that Dr. Brewer's opinion is not based on medically acceptable diagnostic techniques, the ALJ relies exclusively on the testimony of medical expert, Dr. Winkler, and the written statement of state agency physician, Dr. Bullock. Specifically, she relied on Dr. Winkler's opinion that "repeat testing showed the [Lyme] disease was resolved by August or

September 2007 after he received the appropriate treatment." (R.25). The ALJ cited Dr. Bullock for his opinions that he did not find "any significant medical or scientific evidence supporting the existence of Lyme's disease not being 100% cured within six months of the therapy" and that "available evidence shows that people can have chronic Lyme disease for years, but only when they have never been treated for it." (R. 26). From the opinions of Dr. Winkler and Dr. Bullock alone, the ALJ concluded that Dr. Brewer's diagnosis and treatment of chronic Lyme disease and Babesia was "not supported by medically acceptable clinical and laboratory diagnostic techniques." (R. 27-28).

The court cannot accept the ALJ's findings as supported by substantial evidence. First, the ALJ calls Dr. Winkler a "specialist" but without establishing the relevance of her specialization to the diagnosis and treatment of Lyme's disease or Babesia. More importantly, the record simply does not show Dr. Winkler to possess certification, training or experience that is superior to Dr. Brewer, M.D. F.A.C.P., who practices in a clinic named, "Plaza Infectious Disease, PC" (R. 1210) and who began treating the claimant in April 2008 based on a referral for ongoing neurological symptoms from Lyme's disease (R. 911). Dr. Winkler's familiarity with Social Security policy and regulations is hardly relevant or significant to her contrary medical opinion on the diagnosis and treatment of these diseases. As the claimant points out, the ALJ apparently erred in characterizing Dr. Winkler's review to have included

the "complete documentary record." (R. 27). Dr. Winkler testified to reviewing exhibits 1f through 30F, (R. 48), but it is not established that she reviewed the function reports of the claimant and third parties, medical treatment diaries, medication lists, or the consultative examination report of the psychologist Todd Schemmel. Nor did Dr. Winkler hear the claimant testify about his symptoms or examine the claimant for any clinical signs. Finally, the ALJ's regard for Dr. Winkler's opinion being detailed and supported by references to laboratory findings (R. 27) begs the central question of what are medically acceptable clinical and laboratory diagnostic techniques for chronic Lyme's disease and Babesia.

Based on the cursory opinions of Dr. Winkler and Dr. Bullock, neither of whom presumed to lay a foundation for establishing what would be the full range of medically acceptable diagnostic techniques for these diseases, the ALJ was quick to discount Dr. Brewer, and presumably Dr. Sahgal, both of whom appear to be specialists in infectious diseases, as having opinions based on diagnostic techniques outside the range of medical acceptability. The medical record shows that Dr. Winkler and Dr. Bullock both regarded Lyme disease as cured quickly with treatment and that chronic Lyme disease was either the result of complete failure to treat or misdiagnosis. (R. 48, 50, 1102). As the claimant points out, the medical literature available through the Center

for Disease Control[1] and through the U.S. Department of Health and Human Services National Institutes of Health, Allergy and Infectious Diseases[2] confirms the difficulty in diagnosing and explaining chronic Lyme disease and further confirms the medically accepted fact that some patients experience persisting severe symptoms even after treatment despite the absence of other evidence to confirm an active infection:

> After being treated for Lyme disease, some patients still report non-specific symptoms, including persistent pain, fatigue, impaired cognitive function, or unexplained numbness. These patients often show no evidence of active infection and may be diagnosed with post-Lyme disease syndrome (PLDS). In patients with PLDS, studies have shown that more antibiotic therapy is not beneficial and the risks outweigh the benefits.
> http://www.niaid.nih.gov/topics/lymeDisease/research/Pages/antibiotic.aspx
>
> What is "chronic Lyme disease?"
> Lyme disease is an infection caused by the bacterium Borrelia burgdorferi. In the majority of cases, it is successfully treated with oral antibiotics.
> The term "chronic Lyme disease" (CLD) is very confusing, as it has been used describe people with different illnesses. While the term is sometimes used to describe illness in patients with Lyme disease, in many occasions it has been used to describe symptoms in people who have no evidence of a current or past infection with B. burgdorferi (Infect Dis Clin N Am 22:341-60, 2008). In other cases, "CLD" is used in patients who have non-specific symptoms (like fatigue and pain) after treatment for Lyme disease, but who have no evidence of active infection with B. burgdorferi. Physicians sometimes describe these patients as having post-Lyme disease syndrome (PLDS).

---

[1] See Adams v. Astrue, 2013 WL 609859 at *6 (W.D.N.C. 2013) (medical testing of Lyme disease that referenced "the standards set forth by the CDC for diagnosing Lyme disease.")

[2] See Farrell v. Astrue, 692 F.3d 767, 770 (7th Cir. 2012) (court considers information from NIH's website in evaluating diagnosis of fibromyalgia).

Because of the confusion in how the term CLD is employed, experts in this field do not support its use (New Enl J Med 357:1422-30, 2008).

How is Lyme disease treated?

For early Lyme disease, a short course of oral antibiotics such as doxycycline or amoxicillin is curative in the majority of the cases. In more complicated cases, Lyme disease can usually be successfully treated with 3 to 4 weeks of antibiotic therapy. In patients who have non-specific symptoms after being treated for Lyme disease, and no evidence of active infection (patients with PLDS), studies have shown that more antibiotic therapy is not helpful and can be dangerous.

Has NIAID looked at the potential benefits of long-term antibiotic therapy on PLDS?

Yes. In an effort to address the confusion regarding appropriate therapy, NIAID has funded three placebo-controlled clinical trials on the efficacy of prolonged antibiotic therapy for treating PLDS. The published results were subjected to rigorous statistical, editorial, and scientific peer review.

. . . .

The studies reinforced the evidence that patients reporting PLDS symptoms have a severe impairment in overall physical health and quality of life. However, results showed no benefit from prolonged antibiotic therapy when compared with placebo in treating those symptoms.

http://www.niaid.hih.gov/topics/lymeDisease/understanding/Pages/chronic.aspx

Post-Treatment Lyme Disease Syndrome

Approximately 10 to 20% of patients treated for Lyme disease with a recommended 2-4 week course of antibiotics will have lingering symptoms of fatigue, pain, or joint and muscle aches. In some cases, these can last for more than 6 months. Although often called "chronic Lyme disease," this condition is properly known as "Post-treatment Lyme Disease Syndrome" (PTLDS).

The exact cause of PTLDS is not yet known. Most medical experts believe that the lingering symptoms are the result of residual damage to tissues and the immune system that occurred during the infection. Similar complications and "auto-immune" responses are known to occur following other infections, including . . . . In contrast, some health care providers tell patients that these symptoms reflect persistent infection with Borrelia burgdorferi. Recent animal studies have given rise to questions that require further research, and clinical studies to determine the cause of PTLDS in humans are ongoing.

http://www.cdc.gov/lyme/postLDS/index.html

This governmentally accepted and published medical information on Lyme disease establishes that there is a condition, sometimes called chronic Lyme disease, but more accurately described as post-treatment Lyme disease syndrome, in which a person who has been treated with antibiotics and who has no evidence of an active infection may still be experiencing symptoms of fatigue, pain and aches that "have a severe impairment in overall physical health and quality of life." *Id.* While the research and study into the cause of this condition is ongoing, the medically accepted facts are that this condition exists in 10 to 20% of patients treated for Lyme disease and it results in lingering symptoms that are a severe impairment. Thus, Dr. Brewer's clinical diagnosis of chronic Lyme disease without laboratory findings of an ongoing active infection following antibiotic treatment is medically acceptable, contrary to the opinions of Dr. Winkler and Dr. Bullock. Additionally, the published information recognizes that some health care providers in this field may tell their patients "that these symptoms reflect persistent infection" and even prescribe continuing antibiotic therapy. *Id.*[3]

---

[3]As the claimant discusses in his memorandum, there are two recognized schools of thought in the medical community on long-term antibiotic treatment for chronic Lyme disease. Dk. 4, p. 26. *See also* http://www.lymedisease.org/lyme101/lyme_disease/lyme_treatment.html The ALJ offers no sound reason for discounting Dr. Brewer's opinion on chronic Lyme disease simply because his treatment approach on a medically recognized condition follows a school of thought different from that followed by Dr. Winkler and Dr. Bullock.

Besides this governmentally published information, the medical record includes the claimant's initial treatment report for Lyme disease dated May 24, 2007. The plaintiff's first treating specialist, Dr. Vivek Sahgal, MD, FACP, an infectious disease consultant, records:

> Charles has not been feeling well for the last year or so. He has been having increasing symptoms with joint pains, gradually increasing memory loss, vision problems, and speech problems. He is also having tingling in the face and the hands, arms, and body in general.
>
> PAST MEDICAL HISTORY: He has had Lyme serologies that were significantly positive.
>
> . . . .
>
> IMPRESSION:
> 1. Lyme disease
> 2. He does have advanced symptoms of arthritis, as well as neurological symptoms.
>
> PLAN:
> 1. Plan is to start him on Rocephin IV on an outpatient basis.
> 2. I have explained to Charles that recovery from his disease is not possible with treatment, but we can prevent further progression. He does understand that, he states.

(R. 756). Thus, another infectious disease expert and treating physician, Dr. Sahgal, offers an opinion on the recovery from a long-standing case of Lyme disease that is consistent with the above medical information and with Dr. Brewer's opinion. The court concludes that the opinions of Dr. Winkler and Dr. Bullock on the diagnosis of chronic Lyme disease are not substantial evidence because they are overwhelmed by the governmentally published medical information on this disease and by the opinions of treating physicians

who specialize in the treatment of infectious diseases. Thus, there is not substantial evidence to sustain the ALJ's decision that Dr. Brewer's diagnosis of chronic Lyme disease is "not supported by medically acceptable clinical and laboratory diagnostic techniques." (R. 27-28). The medical evidence of record sustains Dr. Brewer's clinical examinations and medical conclusions that Pennington was experiencing severe symptoms medically attributable in part to chronic Lyme disease. (R. 904-907, 910-911, 962).

The ALJ's reliance on the opinions of Dr. Winkler and Dr. Bullock to discount Dr. Brewer's diagnosis and treatment of Babesia (WA-1) is no less problematic. The claimant properly cites from the medical record those blood test results by Quest Diagnostics which were positive for antibodies of "WA1 . . . a Babesia-like piroplasm associated with cases of an illness similar to babesiosis in the Pacific Northwest. Little, if any cross reactivity occurs between Babesia microti WA1." (R. 1002, Sept. 2008; R. 1025, Apr. 2008). Dr. Brewer's treatment records and letters consistently reference this co-infection as Babesia (WA-1). (R. 909-910, 927, 962, 1209-1210, 1216). Nonetheless, neither Dr. Winkler nor Dr. Bullock discussed these positive test results for Babesia (WA-1) or the medical acceptability of Dr. Brewer relying on these test results in making that diagnosis. At best, Dr. Winkler testified that, "Looking at his records I'm not sure his titers were ever elevated." (R. 50). The above medical records establish they were for Babesia (WA-1). Dr. Bullock limited his

review to Quest Diagnostics' other test results for "Babesia IgC and IgM levels" without referencing the WA-1 results. (R. 1102). Again, the court concludes there is not substantial evidence to sustain the ALJ's decision that Dr. Brewer's diagnosis of Babesia (WA-1) is "not supported by medically acceptable clinical and laboratory diagnostic techniques." (R. 27-28). For that matter, all of the same analysis likewise demonstrates that substantial evidence is lacking for the ALJ to find Dr. Winkler's and Dr. Bullock's opinions more persuasive on the existence of a medically determinable impairment at step two.

The claimant plainly has made his required showing of underlying medically determinable impairments, supported by medically acceptable clinical and laboratory diagnostic techniques, that could reasonably be expected to produce the claimant's fatigue, headaches, pain, neurological impairments, blurred vision, memory and concentration deficits. As the ALJ here explained, "whenever statements about the intensity, persistence or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must make a finding on the credibility of the statements based on a consideration of the entire case record." (R. 24). While the ALJ's decision includes some general credibility findings against the claimant based on his history of earnings and some allegedly inconsistent statements about his work status and his ability to read, the ALJ never makes a specific finding that the claimant's statements about the

20

intensity, persistence or functionally limiting effect of his impairments are so lacking as not to meet the "de minimis" showing required at step two. More importantly, the medical evidence here, including Dr. Brewer's residual functional capacity assessment as supported by his stated clinical findings and remarks (R. 904-907), precludes a finding that the claimant's impairments are not medically severe at step two.

The court concludes there is not substantial evidence to sustain the ALJ's finding that the claimant did not have a severe impairment for purposes of step two. The plaintiff seeks to have the Commissioner's decision reversed with instructions to grant his claim for disability benefits. A key factor in remanding for further proceedings is whether it would serve a useful purpose or would merely delay the receipt of benefits. *Harris v. Secretary of Health & Human Services*, 821 F.2d 541, 545 (10th Cir. 1987). The court finds that a remand would be useful to insure a proper evaluation of Dr. Brewer's opinions as a treating physician and for the sequential evaluation process to be completed with a full consideration of the record as a whole. In that regard, the court would expect the ALJ on remand to give full consideration to the different third-party information and observations found in the record and to consider the results of Dr. Schemmel's consultative mental status examination despite his failure to administer the MMPI-2.

IT IS THEREFORE ORDERED that the judgment of the

Commissioner is reversed and the case is remanded pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this memorandum and order.

Dated this 23rd day of July, 2013, Topeka, Kansas.

s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge